# DEMAREST, TREASURER, ET AL. v. HOLDEMAN ET AL.

### [No. 5,050.    Filed March 8, 1905.]

1.  APPEAL AND ERROR.—*Improper Parties Appellant.—Effect.*—Where persons are indirectly interested in the result of a suit, but they are not parties to the judgment, they are not proper appellants, and such appeal as to them should be dismissed, but such dismissal does not affect parties appellant who are parties to the judgment below. p. 692.

2.  BANKS AND BANKING.—*Cashier.—Powers.—Receiving Funds Away from Bank.*—A cashier has no power to bind his bank by receiving deposits away from the bank.  Such customer takes the risk that such cashier will properly deliver such money to the bank to the credit of such customer's account.  p. 693.

3.  EVIDENCE.—*Official Acts.—Presumption.*—Where the evidence shows that a county treasurer turned over the money in his office to his successor, but that there was no way by which it could be positively ascertained whether there was included therein the money due a school city, but it was further shown that such treasurer's disbursement record showed such school money had been paid and the warrants therefor had been canceled and returned to the auditor's office and credit given for such payment, the court may properly conclude that such money has passed out of the county treasury.  p. 697.

4.  COUNTIES.—*Compromise.—Treasurer.—School City.—Liability.*—Where the board of commissioners settle with the bondsmen of a county treasurer, and in such settlement they include money due to a school city, and turn the same into the general funds of the county, the school city may compel the county to repay such money to it. p. 698.

From Lagrange Circuit Court; *Joseph D. Ferrall,* Judge.

Action by Melvin U. Demarest, as treasurer of the school city of Elkhart, against William H. Holdeman and others. From the decree rendered, plaintiff and others appeal.  *Reversed.*

*John M. Van Fleet, Vernon W. Van Fleet, Edmund R. Kerstetter, James S. Dodge* and *James S. Dodge, Jr.,* for appellants.

*Miller, Drake & Hubbell, Lou W. Vail, Elias D. Salsbury* and *Perry L. Turner,* for appellees.

ROBINSON, P. J.—This is an action by appellant Demarest, as treasurer of the school city of Elkhart, against appellees, Holdeman, a former treasurer of Elkhart county, Neidig, Miller, Vail, Platter and Lowry, sureties on Holdeman's bond, Berkey, as auditor, and Wood, as treasurer, of Elkhart county, the board of commissioners of the county of Elkhart, and the Elkhart National Bank.    Appellant seeks to recover $5,900, and to set aside the cancelation of certain warrants issued by the county auditor payable to one Finn, appellant's predecessor in office.    Upon a former appeal the complaint was held sufficient as against the several demurrers of the appellees.    *Demarest* v. *Holdeman* (1901), 157 Ind. 467.    Upon issues formed the court made a special finding of facts with conclusions of law thereon.    Appellant Demarest claims the court erred in each conclusion of law and in overruling his motion for a new trial.

The facts found are substantially as follows:    In May, 1897, the county auditor made a distribution of moneys to the school city of Elkhart, amounting to $15,194.67, and on June 2, 1897, made out three orders on the county treasurer for $7,293.75, $7,583.22, and $317.70, payable to Edward Finn or bearer.    Finn, who was the treasurer of the school city, "made an arrangement with Edmund R. Kerstetter, cashier of the Elkhart National Bank, in said bank," that he should receive from the county treasurer, and receipt to him therefor, all moneys coming from him to the school city, "and to deposit said money in said bank and pay it out on the order of the school city," and Finn, at the time, left his school city books with Kerstetter in the bank, which books Kerstetter was to keep.    Afterward, on June 2, 1897, appellee Holdeman, then county treasurer, instructed his deputy, Charles Kolb, to get the three orders, which he did, giving to the auditor receipts therefor, signed "Ed. Finn, by William H. Holdeman."    Kerstetter authorized Holdeman to receipt for the orders in the name of Finn, and to send the money to Kerstetter.    Prior to the time the above

apportionment was made, Holdeman, on April 22, 1897, had advanced to the school city $3,000, and on May 10, 1897, advanced to the school city the further sum of $3,000, both of which advancements were to be applied on the apportionment when made; and after Holdeman got possession of the orders "he paid upon them to said Kerstetter, for said school city, the sum of $6,294.67, and no more." Before this sum was paid over to the school city by the bank, Holdeman, claiming he had overpaid $3,000 upon the apportionment, ordered the bank to retain that sum, which the bank did, and afterwards, on August 13, 1897, upon Holdeman's order, paid that sum to the school city to apply upon, and which was applied upon, the July apportionment of $5,308.03, which had been made in favor of the school city.

It is further found that in May, 1897, Holdeman paid to Kerstetter $2,900, in the treasurer's office, as an advancement to the school city, Holdeman, at the time, taking Kerstetter's receipt signed "Ed Finn, per Kerstetter;" that Kerstetter received this $2,900 for Finn as school city treasurer under the above-mentioned arrangement; that Kerstetter never paid any part of the $2,900 into the bank, nor to the treasurer of the school city, but still retains the same; that he was cashier of the bank from January 1, 1897, to January 1, 1899; that the $3,000 which Holdeman claimed he had paid Kerstetter sometime prior to the June apportionment was not among the moneys turned over by Holdeman to his successor in office and that Holdeman converted the same to his own use; that no part of the June apportionment of $15,194.67 was ever paid directly by Holdeman to the school city or its treasurer, but all payments that he did make upon this apportionment were paid to Kerstetter, and Holdeman paid to Kerstetter upon this apportionment $12,194.67, and no more, all of which, except $2,900, Kerstetter paid into the bank; that the bank paid over to the school city, of the moneys it so received from Kerstetter to apply upon the June apportionment, the sum of $9,294.67, and

no more; that the school city has never received $5,900 of the June apportionment, which sum, with interest, is due and unpaid; that after Holdeman got possession of the orders above mentioned, he wrote across the face of each, "Paid June 3, 1897, William H. Holdeman, treasurer of Elkhart county;" he then gave them to the county auditor, who filed them away among the paid and canceled orders, where they had since remained; that on October 4, 1898, Cyrus Seiler, Finn's successor in office, demanded of Delos N. Weaver, Holdeman's successor, the $5,900, and brought an action of mandamus; that appellee Wood, Weaver's successor, answered that he found the orders canceled and filed away with the paid and canceled orders in the auditor's office; that his predecessor claimed they were paid; that he had no personal knowledge of the matter, and could not safely pay any money upon them until it first should be determined by some competent tribunal that something was unpaid upon them; that the Supreme Court held this answer a bar to the action; and that, as the answer was true in fact, the relator dismissed his action June 18, 1900.

In June, 1900, appellant, as Seiler's successor, demanded of appellee Berkey, county auditor, that he sue Holdeman on his bond for the $5,900; that Holdeman failed to turn over to Weaver, his successor, all moneys he held as such treasurer, and on May 19, 1898, pursuant to an order made by the appellee board of commissioners on the day previous, having the report of an expert, an action was brought against Holdeman and the sureties on his bonds, the complaint alleging that from the 9th day of January, 1897, to the 19th day of October, 1897, Holdeman was county treasurer; that during that time he collected and received taxes and other moneys due Elkhart county in the sum of $25,000, for the use of the general revenue of the county; that on the 19th day of October, 1897, Holdeman was removed from office, and had in no way legally accounted for this amount or any part thereof, and had wholly converted the

same to his own use; that afterwards, on November 1, 1898, the parties to that action, with the approval of the board, compromised and settled the same; that this settlement, which was approved by the board, and entered of record, states that the balance of the shortage due the county of Elkhart, adding interest and penalty necessary to pay court costs and attorney fees, was $14,000, "which said amount is this day agreed upon between" the board of commissioners, the prosecuting attorney and the bondsmen, and, "whereas all of the facts and reports are duly examined" by the parties, "the sum of $14,000 agreed upon is a full and complete settlement of all demands of the county of Elkhart, of the State of Indiana, by reason of said shortage under the various official bonds of the said William H. Holdeman;" that it was ordered by the board that the sum of $14,000 to be paid by the bondsmen to the then county treasurer in full of all demands of the county against the bondsmen and in full satisfaction of the shortage of Holdeman and "said sum of $14,000 is now paid to said Weaver;" that it was further ordered that an order be drawn in favor of the prosecuting attorney in the sum of $400 in full payment of all court costs and attorneys' fees; that the $14,000 was then and there paid by the sureties of Holdeman into the county treasury, and afterward, on the 14th day of December, 1898, the action was dismissed; that in the spring of 1897, Holdeman, as treasurer, had borrowed $7,500 from the Elkhart National Bank for and on behalf of Elkhart county, and it was the claim of the bank, at the time this suit was commenced, that Holdeman had used the $5,900 in paying this loan; that the board of commissioners have always denied that the money was thus used; that the court finds the fact to be that neither the $5,900 nor any part thereof, was thus appropriated to the use of the county; that the expert who examined Holdeman's accounts did not include any shortage upon these three orders, but the prose-

cuting attorney, the county auditor, and all the appellees in this action knew of the claim of the school city that it was short $5,900 on these orders long before the action was commenced against the bondsmen; that appellant, at the time he commenced this action, was unable to locate the $5,900, and it was uncertain whether or not that amount was among the moneys which Holdeman had turned over to Weaver; that Weaver had no information from which he could determine whether the $5,900 was among the moneys turned over to him by Holdeman, nor had Weaver any information as to what particular fund or funds the moneys received from Holdeman belonged; that Weaver placed all the money so received into the general funds of the county; that Holdeman, at the time he canceled these school city orders, made an entry in the disbursement record in his office showing that the orders had been paid in full to Finn, then school treasurer; that there is no receipt for the $2,900 nor for the $3,000, being the two payments which Holdeman claims he made to Kerstetter in payment of the $5,900, in the possession of any person, so far as can be discovered, except the canceled orders. Holdeman's bond as treasurer was in force at the time the $5,900 in controversy was received by him as treasurer, and was also in full force at the time he ceased to be county treasurer.

It is further found that on the 7th day of March, 1898, Knopf, school city treasurer, sued the county auditor, setting out the same transaction described in this complaint, asking a writ of mandamus requiring the county auditor to draw his warrant in favor of the school city for this $5,900; that subsequently on May 19, 1898, a suit was brought by the State, on the relation of the county auditor, against Holdeman and the sureties to recover $25,000, which it was alleged Holdeman had failed to pay over to his successor, being the same action hereinbefore referred to; that on October 4, 1898, the suit brought by the school city treasurer in March having failed, Cyrus Seiler, as school city

treasurer, sued, asking a writ of mandamus to compel the
county treasurer to pay the school city this $5,900; that in
November, 1898, while these actions were pending, the
board of commissioners, the county auditor, and the sureties
on Holdeman's bonds, disputed as to the amount of Holde-
man's defalcation, and as to their liability on certain mat-
ters claimed by the board, "and the claim sued on in this
action was then and there discussed as a part of said short-
age of said Holdeman;" that the bondsmen entered into
negotiations with the board and county auditor to settle all
matters of default of Holdeman while county treasurer, and
then offered to pay to Elkhart county $14,000 in full settle-
ment and compromise of all defalcations and shortages of
Holdeman, and in settlement of all matters in controversy
in such litigation by reason of such shortage, which offer
was then accepted by the board and auditor, and thereupon
the sureties paid over the sum of $14,000 to the county, and
in consideration of such payment it was then agreed that the
sureties were released from any liabilities upon the bond of
Holdeman, and that all matters affecting the sureties were
settled, and the same made of record by the board as herein-
before set out; that the payment of $14,000 was then under-
stood by the board, the county auditor, and the appellee
sureties in this case, to be a full and complete settlement of
all claims of whatsoever nature arising out of the failure of
Holdeman properly to account for and pay over the moneys
that came into his hands as treasurer, and thereupon the suit
against the sureties upon the bond was dismissed; that
Kerstetter, in receiving the $2,900 from Holdeman, and re-
ceipting therefor, was the agent of Finn, then school city
treasurer; that the $2,900 and interest now amounts to
$3,935.60; that the $3,000 and interest to the present time
amounts to $4,069.50; that the $14,000 paid on compromise
and settlement by the bondsmen was paid into the county
treasury on the 1st day of November, 1898, and covered
into the general fund of the county; that the proportionate

share of $14,000 to $3,000 is $2,470.60; that this sum, with interest from November 1, 1898, amounts to $3,142.60, no part of which has ever been paid by Elkhart county to the appellant.

The court stated as conclusions of law: (1) That appellant is entitled to recover $3,142.60 from the board of commissioners; (2) that appellant is entitled to recover $926.90 from Holdeman; (3) that appellant is not entitled to recover against the other appellees. The judgment follows the conclusions of law, and renders all costs against appellant.

1. Melvin U. Demarest, Edwin Finn and Edmund R. Kerstetter are named in the assignment of errors as co-appellants, and each has separately assigned error. Neither Finn nor Kerstetter is a party to the action in the trial court, neither is mentioned in the conclusions of law, and no judgment was rendered either for or against either of them. During the formation of the issues, appellant Demarest filed a written notice to. Finn to appear and take charge of the litigation in regard to a certain issue tendered by an answer filed by the sureties on Holdeman's bond, which notice was received by Finn May 12, 1902. A record entry recites that on May 29, 1902, "comes also Edwin Finn, who appears by counsel, and files an answer in denial as follows, to wit: 'State of Indiana, Elkhart County—ss.: Melvin U. Demarest, treasurer, etc., v. William H. Holdeman *et al.* Comes now Edwin Finn, and for reply to the third answer of said defendants heretofore filed herein, and denies each and every material allegation therein contained in so far as any or all of said allegations refer to the said Edwin Finn as treasurer of the school city of Elkhart, Indiana.' " It does not appear that at any time he was made a party or that there was any request that he be made a party. After the cause was submitted for trial, appellee the Elkhart National Bank, by its attorney, filed a notice, and made proof of service of the same, to Edmund R. Kerstetter that

the bank's codefendants were claiming the $5,900 was paid to Kerstetter as cashier of the bank; that none of the bank's books showed that Kerstetter received the money, or that he credited it to the bank, and that, if he did receive it, he never paid it over to the bank, nor accounted for it to the bank, and he was notified and required to take charge of the defense of these claims as to that amount; that the bank claimed that if he received the money he was primarily liable for it, and they would look to him to account for the sum and interest in case judgment should be rendered against the bank. Kerstetter made no appearance, was not made a party, and there was no request that he be made a party.

It is insisted that, as the interests of Demarest are adverse to the interests of Kerstetter and Finn, they can not join as appellants, and that the appeal should be dismissed. As neither Finn nor Kerstetter is a party to any judgment that will in any way be affected by this appeal, they are not proper parties to the appeal. The trial court rendered no judgment against either of them, nor did it give either of them a judgment against anyone. If they had rights or interests involved in the litigation which they desired to protect, the statute provides the manner in which it could be done. If the judgment of-the trial court on this appeal be reversed, they will not be relieved from the effects of any judgment against them, nor will they have any rights given them by any judgment secured by an affirmance of the judgment appealed from. As they are not properly either appellants or appellees, the fact that they are named as appellants can not prejudice the rights of Demarest as an appellant. As to Kerstetter and Finn, the appeal is dismissed.

The judgment follows the conclusions of law. The theory of appellant Demarest, as stated in the brief, is that Holdeman left the $5,900 in the county treasury, and that it was converted into the general fund and used by the county.

2. It is first argued that the finding shows that Kerstetter in his official capacity as cashier of appellee bank,

and not in his private capacity, was made the agent of Finn to receive the school moneys. It is found that Finn made an arrangement "with Edmund R. Kerstetter, cashier of the Elkhart National Bank, in said bank, that he should receive from the county treasurer, and receipt to him therefor, all moneys coming from him to said school city, and to deposit said money in said bank and pay it out on the order of said school city." This finding also states that Finn at the time left his school city books with Kerstetter in the bank, which books Kerstetter was to keep. It is also found that under this arrangement Kerstetter received $2,900 from Holdeman for Finn, and that "Kerstetter, in receiving said $2,900 from said Holdeman and receipting therefor, was the agent of said Finn, then treasurer of said school city." It is true in the first of the above findings some doubt might arise as to the meaning intended by the court to be given the words immediately following Kerstetter's name, but, taken together with the findings above, there is no ambiguity. It is argued at some length that the evidence shows that the bank was the agent of Finn. Unless we can say that there is no evidence to support the court's finding that Kerstetter was the agent of Finn, we can not disturb the finding. Evidence, oral and documentary, was introduced, supporting the respective views of the parties to this issue, and, unless we were authorized to weigh the evidence, we can not question the court's conclusion.

Kerstetter was cashier of the bank located at Elkhart. The $2,900, for which appellant seeks to hold the bank, was paid by Holdeman to Kerstetter in the county treasurer's office at Goshen, taking a receipt signed "Ed. Finn, per Kerstetter." The latter testified that in the arrangement between him and Finn nothing was said about getting money from the county treasurer; that he (Kerstetter) was simply to receipt for any money that came to the bank for his account. Conceding, without admitting, that the county treasurer might make this irregular advancement, the

treasurer of the school city was the only person entitled to receive the money. It was Finn's duty, as treasurer, to receive the school money, but he had authorized an agent to receive it for him. If Finn had been present at the county treasurer's office, and had received this money himself from the treasurer, and had at once paid it over to Kerstetter, is it material, so far as the bank's liability is concerned, whether he paid it to Kerstetter as cashier of the bank or to Kerstetter as an individual? It is true Finn testified that he understood that the bank was to keep the book, and do his business, and be the school treasurer so far as receiving money from the county treasurer was concerned, and the disbursement of it; but he also testified that he understood that the bank was to receive such county moneys as came there, and pay those moneys out on the order of the school board. One of the stipulations at the trial was that all parties agreed that Holdeman paid to the Elkhart National Bank the sum of $9,294.67, and that this amount was paid over by the bank to the school city. This was the June apportionment except the $5,900. But the fact that the bank had received the $9,294.67 does not necessarily establish its liability for the $2,900 now in question.

If the bank was Finn's agent, it could properly be concluded, from the evidence, that it was not required to receive the money other than in the ordinary and usual way. If Finn had paid to Kerstetter at Goshen this amount of private funds to be by him carried to Elkhart and deposited to Finn's credit, he may have paid it to him because he was cashier of the bank; but if it never reached the bank Finn could not hold the bank good for the amount. We think the same rule would apply in the case at bar that applies in the supposed case.

In 1 Morse, Banks and Banking (4th ed.), §168f, after recognizing the right of a cashier to follow up a delinquent debtor of the bank and exact payment from him at any time and place when and where he may be able to do so, it is

said: "But where money is offered for credit on a deposit account it is clear that it should not be accepted away from the bank. The bank does not contemplate any such method of receiving deposits, but has provided an entirely different system. Clearly, therefore, it does not empower its cashier thus to receive them. He can not bring them instantly to account in the bank, nor secure them with the safeguards always provided in banks for the preservation of other funds. But if he does so receive them, and then loses or misapplies them before he has actually transferred them into the corporate possession, the question arises, Can the payer hold the bank to make good the amount? Clearly, we say, he can not. Even though the cashier may have had the identical money in his pocket at and after the time of his return to the bank, nothing short of his actual transfer over and bringing it to account in the bank can make the bank liable. The transaction, even in this form, differs materially from the case of an acceptance or certification previously supposed. In that case the cashier was acting strictly as an agent of the bank. He could possibly do the act in no other capacity. Whereas in taking the money it must be held that he was acting as agent for the party paying it; the trust and object of his agency being that he should make the payment into the bank to the credit of the payer's deposit account. He was the agent of the payer for this purpose, selected as a convenient agent because he was also an agent of the bank. The money was paid to him doubtless *because* he was cashier, but it was not paid to him *as* cashier. The latter character could not be given to the transaction, even if both parties sought to do so; for they must both be affected with knowledge of the rule of law which renders a payment made under such circumstances irregular and improper, and so invalid as against the bank. It is fair then to say that in no part of the transaction can it be admitted that the cashier was acting officially, even though irregularly so. His acts should be regarded, not as irregularly official,

but as absolutely unofficial. Therefore the obligation which he owed to pay the money into the bank ran to the party paying it to him for that purpose, not to the bank; his breach of it would make him liable to that party, not to the bank; the loss arising from the breach must be borne by that party, who was in fact his principal in the agency, not by the bank, which was known to all concerned to have strictly excluded any such function from the scope of his official agency.   *   *   *   The person dealing with him knew, or was at law bound to know, that the dealing was, under the circumstances, irregular, improper, and beyond the scope of the cashier's agency. The transaction might be capable of being made right in the future, when the cashier should return to the bank. But until that time, and until, as a matter of strict fact, it had actually been so made right, it must be invalid as against the bank. That it should not be made right at all is a chance which may come to pass, either through the mistake, the negligence, the innocent loss, or the fraud of the cashier. Now clearly the third party takes the chance of the mistake or the loss, and why not equally of the negligence or fraud? He trusts that everything will go right, that the cashier will be careful and honest. But the sufficiency of both the care and the honesty is his own risk; for he has confided in them of his own independent motion, not under the invitation or holding out of the bank, but in fact with the express knowledge, either actual or conclusively inferred at law, that the bank warrants neither when they are relied upon under such circumstances." See, also, *Tulley* v. *Citizens State Bank* (1897), 18 Ind. App. 240.

3. It is also argued there is no evidence to sustain the finding that Holdeman converted the balance of the $5,900 —$3,000—to his own use; that it was his duty to pay this money over to his successor, and the presumption is he fulfilled that duty. It is true it is found that Holdeman's successor, Weaver, had no information from which he could

determine whether or not the $5,900 was among the moneys turned over to him by Holdeman, nor had Weaver any information as to what particular fund or funds the moneys so turned over to him by Holdeman belonged, and that Weaver placed all the money so received by him from Holdeman into the general funds of the county. It is quite true that the presumption is that an officer has performed his duty, and, in the absence of some showing to the contrary, it would be presumed that a retiring county treasurer had paid over to his successor all moneys held by him as such officer. When we consider the conduct of Holdeman at the time he claims to have paid this $3,000, and the circumstances surrounding these transactions as described by the record, together with the fact that he entered up the warrants, for which the $5,900 was a part, on the disbursement record, as paid, and returned the warrants to the auditor's office as canceled, the court could properly conclude that the money had passed out of the treasury.

4. It is also claimed that the findings show there was no compromise with the bondsmen; that as there was no controversy about the amount of the shortage, the bondsmen were liable for the amount; and that any agreement that the bondsmen should pay the amount and be protected against the claim in controversy would be without consideration. The compromise was made November 1, 1898. At that time a suit was pending, brought by the county auditor, E. L. D. Foster, as relator, against the sureties, to recover the amount of Holdeman's defalcation, alleged to be $25,-000. At that time also a suit was pending, brought by the school city, asking a mandate to compel the county treasurer to pay the $5,900 here in controversy. In March, 1898, the school city had brought an action against county auditor Foster, asking a mandate to require him to draw his warrant for this $5,900, and when this suit failed the action was commenced against the county treasurer. In the negotiations had by the board, the county auditor, and the

bondsmen, there was a dispute as to certain matters claimed by the board, and the claim sued on was discussed as a part of the defalcation; that the sureties then offered to pay $14,000 in full settlement and compromise of the defalcations of Holdeman, which offer was accepted, and the money paid into the general fund of the county.

Upon the holding in *Vigo Tp.* v. *Board, etc.* (1887), 111 Ind. 170, the county is liable to the school city for the proportionate share of the $14,000 received upon the compromise made by the board and the county auditor. It is liable, not because the defaulting treasurer was the county's agent when he received and converted the money, but because the city's money received upon the compromise was paid into the general fund of the county.

The question then arises, what authority, if any, had the auditor and board, in compromising with the bondsmen, to adjust the defalcation as to the school money converted? The sureties were liable on the bond for this $3,000 converted by the treasurer to his own use. Did the board and auditor have authority to compromise that claim with the sureties, and upon payment of part of the sum release the sureties as to the balance? The trial court's conclusions of law seem to be upon the theory that they had. Upon the authority of *Vigo Tp.* v. *Board, etc., supra,* the county treasurer was not the agent of the county in respect to this money of the school city. The board could occupy no relation of trust in respect of such funds, had no direction or control whatever of them, and had no authority whatever to interfere with the powers and duties of the auditor and treasurer in apportioning, collecting and disbursing such funds. However, the county is liable in this action for whatever of the school city's moneys it received from the sureties and put into the general fund of the county.

The findings do not show in what sum Holdeman was a defaulter, unless it can be said that the sum was $14,000; nor is it shown to what funds the money that was converted

belonged. There is no authority in the finding for saying in what amount, if any, the defalcation was in excess of $14,000. It is true in the suit then pending on the bond the amount claimed was $25,000, but it is not found as a fact that this was the amount. It is found that the school moneys converted by the treasurer were discussed at the time the settlement with the bondsmen was made, and the court finds that the amount of school money for which the treasurer was in default was $3,000. The county, in this appeal, is not questioning the correctness of the judgment against it for the proportionate part of the amount received from the bondsmen in the settlement with them. The findings do not authorize the conclusion that the sureties paid in settlement anything less than the actual amount of the defalcation. If the amount of the defalcation was $14,000, and the school claim was included in the settlement, that claim was paid in full by the sureties, and, as the amount was placed in the general fund of the county, the county became liable for the amount of school money so received.

The conclusions of law should have been that appellant is entitled to a judgment against the board for the $3,000, with interest, instead of $2,470.60, with interest, and that appellant is not entitled to recover against the other appellees. Judgment reversed, with instructions to restate the conclusions of law.