WELLSTON TRUST COMPANY, A CORPORATION, RESPONDENT, v. AMERICAN SURETY COMPANY OF NEW YORK, A CORPORATION, APPELLANT.*—14 S. W. (2d) 23.

St. Louis Court of Appeals. Opinion filed February 5, 1929.

242

*Corpus Juris-Cyc. References: Banks and Banking, 7CJ, section 240, p. 596, n. 18; section 320, p. 638, n. 64; Burglary and Theft Insurance, 9CJ, section 5, p. 1096, n. 12; section 7, p. 1096, n. 24; Corporations, 14aCJ, section 2168, p. 319, n. 83; section 2169, p. 320, n. 88; section 2175, p. 334, n. 67; Insurance, 32CJ, section 199, p. 1109, n. 13.

*Bryan, Williams & Cave* for appellant.

*Marion C. Early* and *Ivon Lodge* for respondent.

SUTTON, C.—This is an action on an insurance policy. The pertinent provision of the policy is substantially as follows:

"The American Surety Company of New York, in consideration of an annual premium agrees to indemnify Wellston Trust Com-

pany, hereinafter called the insured, against the direct loss sustained of any money or securities, or both, in which the insured has a pecuniary interest, or held by the insured as bailee, trustee or agent, and whether or not the insured is liable therefor, through robbery, larceny, theft, or hold-up by whomsoever committed while such money or securities are in transit within twenty miles of any of the insured's offices and in the custody of any of its employees.''

In the afternoon of September 7, 1926, while the policy was in force, George Blackford, who was at the time and had been for several years in the employ of plaintiff, went with Harry A. McKee, the plaintiff's treasurer and cashier, to the office of the Peoples Motorbus Company in Wellston for the purpose of receiving money belonging to the motorbus company to be taken back to the bank. They got three sacks of money from the motorbus company, and Blackford entered the items in the motorbus company's pass book. They then started back to the bank with the money in an automobile, and, while so engaged in transporting the money to the bank, they were held up, and the three sacks of money were taken from them. The sacks contained respectively $1498.75, $1217.80, and $1566.90. These items were entered in the pass book separately. Duplicate deposit slips were made out for each of these items. One copy of each duplicate slip was retained by the motorbus company, and the other was put in the sack containing the money represented by the deposit slip. These duplicate slips were prepared by the employees of the motorbus company. It was, however, the usual practice of the customers of the bank when making deposits to prepare the deposit slips. The motorbus company had been making deposits with the plaintiff bank for a year and a half prior to the robbery. The deposits were sometimes made at the banking house, and at other times were received at the office of the motorbus company by the cashier or other employees of the bank sent to the motorbus company by the bank to receive the deposits. The pass book of the motorbus company was the same kind generally used by the customers of the bank. The pass book in which the deposits were entered on the day of the robbery was the same pass book in which its deposits were entered when made at the banking house. The practice of receiving the deposits of the motorbus company at its office in the manner the deposits were received on the day of the robbery had obtained for a year and a half, with the knowledge of all the active executive officers of the bank. On some occasions the manual act of entering the deposits in the pass book was done by the cashier, and on other occasions by some other employee, of the bank. The form of deposit slip that was used by the motorbus company was the same form that was generally used by all the depositors of the bank. The motorbus company had only one pass book, and

its deposits were entered in this pass book whether the deposits were made at its office or at the banking house. The account of the motorbus company with the bank was the only account as to which the practice obtained of receiving the deposits outside the banking house. It was the practice, when deposits were received at the office of the motorbus company, to enter such deposits to the credit of the motorbus company in the deposit record of the bank when the deposits reached the bank. When this was done, no receipt or other acknowledgment or evidence of the deposits was sent by the bank to the motorbus company. The only evidence of the deposits held by the motorbus company was such as it received from the agents of the bank at the office of the motorbus company. On the day following the robbery, plaintiff entered in its deposit record a credit to the motorbus company for $4283.45, this being the amount of money received at the office of the motorbus company by the plaintiff's agents and taken from them in the robbery, and afterwards paid out that amount on the checks of the motorbus company.

The trial of the cause, which was had before the court, without a jury, resulted in a judgment in favor of plaintiff for $4432.91, which is the amount of the loss, with interest, and defendant appeals.

Defendant assigns error here for the refusal of its instruction in the nature of a demurrer to the evidence. As ground for this assignment defendant urges that the cashier of the plaintiff bank was acting as the agent of the motorbus company, and not as the agent of the bank, in receiving and transporting the money from the office of the motorbus company to the bank, and that therefore the loss of the money was a loss not covered by the policy. Defendant says that this is so under our statute, and also under the general banking law as announced by the decisions, regardless of the statute.

Section 11737, Revised Statutes 1919, provides that every banking corporation is authorized and empowered:

"To conduct the business of receiving money on deposit and allowing interest thereon not exceeding the legal rate or without allowing interest thereon, and of buying and selling exchange, gold, silver, coin of all kinds, uncurrent money, of loaning money upon real estate or personal property, and upon collateral or personal security at a rate of interest nor exceeding that allowed by law, and also of buying, investing in selling and discounting negotiable and non-negotiable paper of all kinds, including bonds as well as all kinds of commercial paper; and for all loans and discounts made, such corporation may receive and retain in advance the interest: Provided, however, that no bank shall maintain in this State a branch bank or receive deposits or pay checks except in its own banking house."

The proviso of the section is relied on by defendant. No penalty is attached to the violation of the proviso. It was intended manifestly as a restriction or limitation of the scope of the powers granted in the preceding provisions of the section.

In support of its view defendant cites the following cases: Moses Lake State Bank v. Bell, 128 Wash. 523; Fidelity & Deposit Co. v. Colby, 148 N. Y. (App. Div.) 363; Demarest v. Holdeman, 34 Ind. App. 685; Gonder v. The Farmers National Bank, 259 Pa. St. 197.

In the Bell case, one McKinsey, who was then employed by the bank to make collections, but was not an officer of the bank, received the deposit in question at a place other than the banking house. The deposit never reached the banking house, but was lost or converted by the employee. The court in disposing of the case said that it seemed to be well settled banking law that, in order to charge a bank with liability as for a general deposit, the deposit must have been actually made at the banking house of the bank sought to be so charged; that when a would-be depositor of a bank places his funds in the hands of an employee of the bank at some place away from the bank, there is not thereby consummated a deposit chargeable as such against the bank, however much the would-be depositor and such employee may have intended such act as consummating a deposit; and that such act goes no farther in its legal effect than to make the employee so receiving such funds an agent of the would-be depositor to cause such funds to be actually deposited in the bank at its usual place of doing business. But what was said in that case must be read in the light of the facts peculiar to that case, stressed by the court in its opinion, to-wit: The employee who received the deposit was not an officer of the bank. The deposit was never delivered to any officer of the bank, even away from the bank. The depositor was never given any written evidence in the form of a credit deposit slip, or in the form of a credit in his pass book, or otherwise, for the deposit. In the present case the deposit was delivered to an officer of the bank, who was both treasurer and cashier, and he entered the deposit, or caused the same to be entered, in the pass book of the depositor when the deposit was received. Besides, this was done in accordance with a uniform practice long pursued, with the knowledge of all of the active executive officers of the bank.

In the Colby case, the bookkeeper of the bank induced persons to deliver money to him at his boarding house to be deposited to their credit in the bank. He did not deposit the money in the bank, but converted the same to his own use. It was held that he was the agent of the depositors, in the absence of proof that he was authorized by the bank to receive the money as its agent. In delivering the opinion in the case the court stressed the following facts: There was no definite representation made by the bookkeeper to the depositors

that he was authorized to act as agent for the bank in receiving the money for it. The inference was rather to the contrary, for he was getting the money primarily to help him in his standing in the bank. There was no evidence that the bank authorized him to receive the money as its agent. It was not within the compass of his duties to receive the money even in the bank. None of the officers of the bank knew anything about the course the bookkeeper was pursuing. He never advised any of them that he was receiving money on behalf of the bank. There was no proof that any one was authorized to accept money elsewhere than at its usual place for doing business. There was no assent on the part of the officers of the bank to the acceptance of the money of the depositors at the boarding place of the bookkeeper. The distinction between that case and the present case is obvious.

In the Demarest case, the court announces broadly that a cashier has no power to bind his bank by receiving deposits away from the bank, and that the depositor in such case takes the risk that the cashier will properly deliver the deposit to the bank to the credit of the depositor. But the facts in that case clearly show that the cashier in receiving the deposit did not act or assume to act as agent of the bank. He did not enter the deposit in the pass book of the depositor or give him a deposit slip. He received the deposit from the county treasurer, and receipted to the county treasurer for the deposit, as the agent of the treasurer of a school city whose agent he in fact was. The deposit never reached the bank but was converted by the cashier to his own use. It was under these circumstances that the court held that the cashier was not the agent of the bank in receiving the deposit.

In the Gonder case the court expressed itself as "inclined to think that the better rule is to hold the depositor liable for the agency of the officer of the bank for acts done outside of usual banking hours and away from the place of banking." But this rather timorous expression of the rule must be regarded as mere *obiter*, since the court on the facts of the case held the bank liable.

A different view was taken in Pendleton v. Bank of Kentucky, 1 T. B. Monroe 171. In that case money was given to the cashier of a bank, as a deposit, on the street, after banking hours were over, in his character as cashier, under his promise to place it to the credit of the depositor. It was contended in that case, as here, that the cashier acted as agent of the depositor, and not as agent of the bank, in receiving the deposit. Responding to this contention, the court said:

"It is true, the officers of the bank may not be compelled, either to accept or make payment, except in banking hours, and in some cases, at their banking house; but if they do so at other times and

places, and misapply the funds of the bank, we have no doubt they become officially liable, and their sureties must be responsible for such acts. We view a cashier as holding his office at every time and place, and if, at any time different from hours of banking, or at places far remote from the banking house, he shall convert the funds of the bank to his own use, the institution has a right to recover such funds, on his official bond.''

So, too, it is held that the rule that the bank is not liable in case an employee receives a deposit outside of the bank, does not apply where the bank acquiesces in or ratifies such action. [7 C. J. 637; Jumper v. Commercial Bank, 48 S. C. 430.]

There can be no doubt under the facts of the present case that the cashier of the plaintiff bank actually acted as the agent of the bank in receiving the deposits of the motorbus company at its office, and that he was authorized to so act by the bank. This is shown by the long continued practice of receiving the deposits of the motorbus company, and entering the same in its pass book, at its office, with the knowledge and acquiescence of all the active executive officers of the bank.

It is said that the entry of a deposit in the depositor's pass book is an admission of indebtedness to the depositor on the part of the bank and a contract to repay the money to the depositor or to his order. Unquestionably such an entry is prima-facie evidence of the obligation or contract which springs from the acceptance by the bank of a deposit as such. [7 C. J. 637; Southwest Nat'l Bank v. House, 172 Mo. App. 197, 1. c. 202, 157 S. W. 809; Lucks v. Bank, 148 Mo. App. 376, 128 S. W. 19; Brigance v. Bank of Cooter (Mo. App.), 200 S. W. 668; Quattrochi Bros. v. Farmers & Merchants Bank, 89 Mo. App. 500, 1. c. 508.] So that, when the cashier of the plaintiff bank received the money of the motorbus company as a deposit and entered the same in its pass book on the day of the robbery, he undertook on behalf of the bank to evidence such a contract with the motorbus company, and this was done with the authority or acquiescence of the bank, for precisely the same sort of contract had been previously evidenced in the same manner almost daily for a year and a half at the office of the motorbus company, with the knowledge of all the active executive officers of the bank.

But the defendant says that, notwithstanding the cashier actually acted as the agent of the bank, with the authority or acquiescence of the bank, in receiving the money of the motorbus company as a deposit and entering the same in the pass book of the motorbus company at its office, thus evidencing the contract which springs from the acceptance by the bank of money as a deposit, yet the legal effect of the transaction was to make the cashier the agent of the motorbus company to cause the money to be actually deposited in

the bank at its banking house; in other words, that it must be conclusively inferred that the cashier was acting as agent of the motorbus company and not as agent of the bank. This, in its final analysis, is only another way of saying that the contract entered into by the cashier of the bank on its behalf in accepting the money of the motorbus company as a deposit was null and void because *ultra vires* and in contravention of the statute. Such is not the law. The decisions in this State uniformly hold that an *ultra vires* contract, not wholly executory, though expressly prohibited by statute, is not void, but voidable only. Where the contract is wholly executed, it is not void, nor is it voidable at the instance of either the one or the other of the contracting parties, much less at the instance of a third party or a stranger. Where it has been fully executed by either the corporation or the other contracting party, it is not void, but voidable only. Certain it is that such a contract is not voidable at the instance of the party receiving the consideration of the contract, without a restoration of what was received. [Hall v. Farmers' & Merchants' Bank, 145 Mo. 418, 46 S. W. 1000; Bank of Tupelo v. Stonum (Mo. App.), 281 S. W. 110; St. Francois County Bank v. Hawn (Mo. App.), 296 S. W. 1052; First National Bank v. Shewalter, 153 Mo. App. 635, 134 S. W. 42; McClintock v. Central Bank, 120 Mo. 127, 24 S. W. 1052.]

In the Stonum case, the court, having under discussion the transaction of a branch bank maintained in contravention of the statute here invoked, said:

"We are also of the opinion that, since maintaining a branch bank is not *malum in se*, and our statute which forbids it attaches no penalty and has no provision making the contracts of a branch bank void or forbidding a suit by the parent bank upon causes of action that may arise from business transactions conducted through the branch bank, that such transactions are not void, and the fact that the transaction took place with the branch bank instead of the parent bank direct could not be used in the defense in the suit by the parent bank. The only party who can raise the question of the legality of the maintenance of the branch bank is the state in some form of action attacking the right of the bank to maintain a branch bank. As long as it is permitted to exist it is the agent of the parent bank, and its acts are binding both on the party dealing with it and the parent bank."

In the Hall case, the plaintiff brought suit to set aside a deed made by the First National Bank of Trenton. The federal statute expressly forbade a national bank to purchase or hold real estate for the purpose for which the deed in question was made and accepted. The court held that though the bank was incompetent by its charter to take the title to real estate, the conveyance to it was not void, but

only voidable, and that the sovereign alone could object. The court refused to set the deed aside at the instance of the representatives of the grantor. In answer to the contention that the deed was never accepted by the bank but was accepted only by its cashier, the court said:

"It was not necessary in order to an acceptance of the deed that the board of directors of the bank should have been called together, and then by resolution of the board accept it. Its acceptance by the cashier must be held to be the acceptance by the bank."

In the Hawn case a note given to the bank for the purchase price of shares of stock of the bank was in suit. It was held that the note was not void though the transaction was forbidden by the statute.

Defendant further insists that the plaintiff bank in receiving the deposits of the motorbus company outside the banking house, was engaged in the doing of an illegal, unlawful, and *ultra vires* act, and that the policy in suit is void as an attempt by plaintiff to indemnify itself against loss arising out of a contemplated violation of the law by plaintiff. In other words, the defendant insists that the receiving of deposits by plaintiff at a place outside the banking house was illegal, unlawful, and *ultra vires,* and that if the policy be construed as intended to cover a loss arising out of that illegal or unlawful act or business, the policy is void. A similar question was up for decision in Morehead Banking Co. v. Tate, 122 N. C. 313. In that case the plaintiff maintained a branch bank in violation of its charter powers, and the action was brought by plaintiff on the bond of the cashier of the branch bank given for the faithful performance of his duties as cashier. In disposing of that case the court said:

"This court would not be willing to sanction this practice of establishing branch banks or agencies to do a banking business unless they are *expressly* authorized by legislative authority contained in the charter. And any bank without having this express grant, undertaking to establish such branch establishments, will lay itself liable to have its charter vacated; but this is a matter for the State, the Attorney-General, and not for the defendants in an action in which they are trying to avoid the obligation of their contract with the plaintiff. . . .

"So, the only question remaining to be considered is as to whether this bond is void on the ground of public policy. Usurious contracts are against public policy, and at one time the courts would not enforce them (Shober v. Hauser, 4 Dev. and Bat.; 91), but this was because they were declared void by statute. The policy of the State is the same now that it was then. But, now, the contract is not void, but only the interest is forfeited. This is so, because it is

so declared by our statute, Code section 3836; Carter v. Ins. Co., at this term. Gambling contracts are void, but this is so because they are so declared by statute. [Code sections 2841, 2842.] Gooch v. Faucett, at this term. There are other contracts, not only contrary to the policy of the State, but also to the *public morals* of the State, that the court will not enforce.

. "But this contract is not one of those declared void by statute, nor is it one that affects the public morals of the State, which call upon the courts to withhold its process and judgment from enforcing it."

We have examined the cases relied on by defendant with respect to this point, and find the principle announced therein inapplicable in the present case. The act of the plaintiff in receiving the deposits of the motorbus company outside the banking house, though *ultra vires* and in contravention of the statute, was not *malum in se*, nor criminal, nor did it affect the public morals. The policy in suit is not a bond given to indemnify plaintiff against the consequences of doing an illegal act. Nor is it a bond given to induce the commission, or in consideration of the commission, of an illegal act. It is a contract, supported by a legal consideration, to indemnify the bank against loss sustained through robbery, larceny, theft, or hold-up. Thus the cases relied on by the defendant are clearly distinguishable from the present case.

Defendant makes the further contention that the policy is to be construed as having been executed by the parties with the intent to cover and indemnify the plaintiff against loss while engaged in carrying on its business in the normal way and in compliance with the law and with its charter powers, and not as an attempt by plaintiff to indemnify itself from loss while engaged in a contemplated conduct of its business in an unusual way and in violation of the law, and that the policy so construed does not cover the instant loss. In support of this contention defendant invokes the rule, universally recognized, that where a contract is fairly and reasonably open to two constructions, the one making it legal and the other illegal, the former must be adopted. We have already shown, however, that the policy construed as covering the instant loss is not illegal, but is a valid and binding contract. There can be no question that the instant loss is expressly covered by the broad and comprehensive terms of the policy. We cannot exclude such loss from the coverage of the policy by implication, nor read into the policy by process of construction an exception or limitation in conflict with its express terms. This is not a surety contract, but an insurance contract. It must be construed liberally in favor of the insured and strictly against the insurer. Whatever else may be said as to the bank's relationship to the money at the time it was lost by the robbery, the

fact remains that the cashier, with the knowledge and acquiescence of the bank, actually received the money as the agent of the bank, and was transporting it to the banking house as such agent. The bank, through its cashier, was in the actual possession of the money, and whether it held the money as owner or as bailee or trustee—and surely it held it in the one capacity or the other—its loss was within the express coverage of the policy.

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Becker* and *Nipper, JJ.,* concur; *Haid, P. J.,* not sitting.